FILED
2023 Sep-08  PM 02:58
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| **JASON C. ODOM,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:21-cv-00612-ACA** |
| | ) | |
| **CITY OF ANNISTON, ALABAMA,** | ) | |
| **et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

Plaintiff Jason Odom is a Caucasian over the age of forty. From 2015 until his termination in 2020, Mr. Odom served as deputy city attorney for the City of Anniston. Mr. Odom's primary responsibility was to serve as the city prosecutor in municipal court. After Defendant Benjamin Little (a city council member) and Defendant Glen Ray (a community activist) publicly complained about Mr. Odom's job performance as deputy city attorney and called for his termination, Anniston's city manager, Defendant Steven Folks, fired Mr. Odom.

Mr. Odom later reapplied for the vacant deputy city attorney position. The City did not rehire him, selecting instead an African American who was older than Mr. Odom. Mr. Odom then filed suit against the City, Mr. Folks, Mr. Little, and Mr. Ray.

The remaining claims in this case are:

(1)     race discrimination, in violation of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2(a), against the City ("Count One");

(2)     race discrimination, in violation of 42 U.S.C. § 1981, against the City ("Count Two");

(3)     age discrimination, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(a), against the City ("Count Three");

(4)     retaliation, in violation of Title VII, against the City ("Count Four");

(5)     retaliation, in violation of § 1981, against the City ("Count Five");

(6)     retaliation, in violation of the ADEA, against the City ("Count Six");

(7)     defamation per se, under Alabama law, against Mr. Little ("Count Seven");

(8)     false light invasion of privacy, under Alabama law, against Mr. Little ("Count Eight");

(9)     tortious interference with business relations, under Alabama law, against Mr. Little ("Count Nine");

(10)    defamation per se, under Alabama law, against Mr. Ray ("Count Ten");

(11)    false light invasion of privacy, under Alabama law, against Mr. Ray ("Count Eleven");

(12)    tortious interference with business relations, under Alabama law, against Mr. Ray ("Count Twelve");

(13)    conspiracy to deprive Mr. Odom of equal protection and his rights under § 1981, in violation of 42 U.S.C. § 1985(3), against Mr. Ray and Mr. Little ("Count Thirteen"); and

(14)   race discrimination, in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, under 42 U.S.C. § 1983, against the City and Mr. Folks ("Count Fourteen").

(Doc. 23 at 18–39; *see also* doc. 47).

Currently before the court are three motions for summary judgment: one filed jointly by the City and Mr. Folks (doc. 60); one filed by Mr. Little (doc. 58); and one filed by Mr. Ray (doc. 62).

The court **WILL GRANT IN PART** and **DENY IN PART** the City and Mr. Folks's motion. Because Mr. Odom was an independent contractor and not an employee, the court **WILL GRANT** the motion for summary judgment as to Counts One, Three, Four, and Six. Because Mr. Odom has not shown that but for his complaint of race discrimination the City would not have rehired him, the court **WILL GRANT** the motion as to Count Five. The court **WILL DENY** the motion as to Counts Two and Fourteen because triable issues of fact exist about whether the City and Mr. Folks intentionally discriminated against Mr. Odom because of his race in violation of § 1981 and his equal protection rights.

The court **WILL GRANT** Mr. Little's motion for summary judgment. Because Mr. Little is entitled to qualified immunity from Ms. Odom's § 1985(3) conspiracy claim, the court **WILL GRANT** Mr. Little's motion for summary judgment on Count Thirteen. Because Mr. Odom has not shown that Mr. Little's statements are slanderous per se, the court **WILL GRANT** Mr. Little's motion for

summary judgment on Count Seven. Because Mr. Odom has not pointed to evidence creating triable issues of fact about whether Mr. Little made statements that placed him in a false light with knowledge the statements were false or with reckless disregard for their truth or falsity, the court **WILL GRANT** Mr. Little's motion for summary judgment on Count Eight. Because Mr. Little was not a stranger to Mr. Odom's relationship with the City, the court **WILL GRANT** Mr. Little's motion for summary judgment on Count Nine.

The court **WILL GRANT IN PART** and **DENY IN PART** Mr. Ray's motion for summary judgment. Because a plaintiff cannot bring a claim under § 1985(3) based on violations of § 1981, the court **WILL GRANT** summary judgment in Mr. Ray's favor on that part of Count Thirteen. But because Count Thirteen also asserts a claim under § 1985(3) for conspiracy to violate Mr. Odom's equal protection rights and Mr. Ray has offered no argument about that claim, the court **WILL DENY** summary judgment on the rest of Count Thirteen. Because Mr. Odom has not shown that Mr. Ray's statements are slanderous per se, the court **WILL GRANT** Mr. Ray's motion for summary judgment on Count Ten. Because there is evidence from which a reasonable jury could find that Mr. Ray made statements about Mr. Odom malice, the court **WILL DENY** Mr. Ray's motion for summary judgment on Count Eleven. Because Mr. Ray's arguments in support of summary

judgment on Mr. Odom's tortious interference claim are not persuasive, the court **WILL DENY** Mr. Ray's motion for summary judgment on Count Twelve.

## I.   BACKGROUND

In deciding a motion for summary judgment, the court "view[s] all evidence and draw[s] all reasonable inferences in the light most favorable to the non-moving party." *Hallums v. Infinity Ins. Co.*, 945 F.3d 1144, 1148 (11th Cir. 2019). "[W]here there are varying accounts of what happened," the court must "adopt the account most favorable to" Mr. Odom. *Smith v. LePage*, 834 F.3d 1285, 1296 (11th Cir. 2016) (quotation marks omitted); *see also Cantu v. City of Dothan*, 974 F.3d 1217, 1222 (11th Cir. 2020) ("The 'facts' at the summary judgment stage are not necessarily the true, historical facts; they may not be what a jury at trial would, or will, determine to be the facts.").

The City of Anniston is a municipality with a five-member city council. (Doc. 57-6 at 4). The city council appoints a city manager responsible for the administrative operations for the City and a municipal court judge to preside over the City's municipal court. (Doc. 57-6 at 4; doc. 57-1 at 15). The city manager appoints the deputy city attorney and the public defender, both of whom appear in the municipal court. (*Id.* at 15, 19; doc. 57-6 at 8).

In 2015, the city manager appointed Mr. Odom as the deputy city attorney. (Doc. 57-1 at 12). Mr. Odom is Caucasian. (*Id.* at 15). In his role as deputy city

attorney, Mr. Odom's primary responsibility was to serve as municipal prosecutor during municipal court proceedings. (Doc. 57-1 at 12; doc. 61-1 at 2 ¶ 7). He also represented the City in appeals of convictions from municipal court and filled in for the city attorney upon request. (Doc. 57-1 at 12–13).

Because this case involves a dispute about whether Mr. Odom was an employee or an independent contractor for the City, the court pauses here to describe the details of Mr. Odom's agreement with the City to serve as the deputy city attorney. While serving as deputy city attorney, Mr. Odom also maintained a private law practice. (Doc. 57-1 at 5; *see also* doc. 61-1 at 2 ¶ 8). Mr. Odom did not complete a Form I-9 for employment authorization verification, and he submitted a Form W-9 instead of a Form W-4 for tax purposes. (Doc. 61-2 at 1 ¶ 2; doc. 68-3 at 2 ¶ 4).

The City paid Mr. Odom a flat monthly rate for his services as the prosecutor in municipal court and an hourly rate for any other services he performed. (Doc. 57-1 at 16–17; doc. 57-2 at 3–4). Mr. Odom's original monthly rate was $2,200.00; the amount increased over time to $2,500.00. (Doc. 57-1 at 16–17). Both the flat rate and hourly rate were inclusive of all overhead and internal office expenses that Mr. Odom or his firm incurred because of the position. (Doc. 57-2 at 4). The City provided Mr. Odom's law firm a Form 1099 for the income he received as deputy city attorney. (Doc. 61-1 at 2 ¶ 10).

The City required Mr. Odom to be present at the municipal court each Wednesday for cases heard during three docket calls. (Doc. 68-3 at 3 ¶ 5). But outside those hours, he set his own schedule. (Doc. 57-1 at 13). The City offered to provide Mr. Odom with an iPad for use as part of his job, but Mr. Odom chose instead to use his personal tablet. (Doc. 68-3 at 3 ¶ 6). Mr. Odom also used his personal cell phone. (Doc. 57-1 at 14).

If Mr. Odom could not be at municipal court on a particular Wednesday, an alternate from a list maintained by the City would fill in for him. (Doc. 57-1 at 15; doc. 68-3 at 3 ¶ 7). Mr. Odom was responsible for paying the alternate from his monthly compensation. (Doc. 57-1 at 16; doc. 68-3 at 3 ¶ 7).

Mr. Odom testified that he understood that he was City employee, subject to the City's rules, policies, and procedures. (Doc. 68-3 at 2 ¶ 2). He received a badge for access to the judicial building that identified him as a City employee and that allowed him to take advantage of City employee discounts at restaurants and other establishments. (Doc. 57-1 at 17; doc. 57-6 at 10, 90; doc. 68-3 at 2 ¶ 3). The City paid for Mr. Odom to attend government seminars and for his admission to the Alabama Association of Municipal Attorneys. (Doc. 57-1 at 16–17).

Defendants Mr. Ray and Mr. Little had problems with Mr. Odom from the start. Mr. Ray is a community activist and the president of the local chapter of the National Association for the Advancement of Colored People ("NAACP"). (Doc.

57-6 at 94 ¶ 7; doc. 57-9 at 4). Mr. Little was an Anniston City Council member from 2000 to 2012 and again from 2016 until November 2020. (Doc. 57-7 at 5–6).

Mr. Ray repeatedly asked Brian Johnson, the city manager who hired Mr. Odom, to replace him with an African American prosecutor. (Doc. 56-7 at 94 ¶ 7). At city council meetings, Mr. Little attacked Mr. Odom and the municipal court and called for Mr. Odom to be replaced with "a minority." (*Id.* at 94 ¶ 8). Mr. Ray, Mr. Little, and another council member not named in the suit would threaten to "organize protests and boycotts" and "burn this place down" if Mr. Johnson would not make a change. (*Id.* at 95 ¶ 11; *see also* doc. 61-1 at ¶ 13).

Messrs. Ray and Little behaved similarly with the next city manager, Kent Davis. (Doc. 57-6 at 98 ¶¶ 8, 10). The two men were particularly outspoken about Mr. Odom's handling of the prosecution of Rozetta Thompson in municipal court. (*Id.* at 98 ¶ 11). In early 2017, Ms. Thompson appeared in municipal court on various traffic offenses, including driving under the influence, improper lane usage, no proof of insurance, and no child restraint. (Doc. 57-1 at 46; doc. 57-3 at 1). Mr. Odom viewed a video of Ms. Thompson's arrest and was "appalled" by her endangerment of an infant in the car. (Doc. 68-3 at 3 ¶ 8). At her initial hearing, Mr. Odom offered Ms. Thompson and her defense attorney a plea agreement pursuant to which Mr. Odom would dismiss certain charges if Ms. Thompson pleaded guilty to the DUI charge. (Doc. 57-1 at 46; doc. 57-3 at 1; doc. 68-3 at 3 ¶ 8). On Mr. Ray's advice,

Ms. Thompson rejected the plea deal. (Doc 57-1, 30, 46, 57-58, 30, 46; doc. 68-3 at 3 ¶ 8). Mr. Odom then informed Ms. Thompson's attorney that he would not accept dismissal of the DUI charge and would pursue it to trial. (Doc. 68-3 at 3 ¶ 8).

Because of a trial conflict in a different court, Mr. Odom could not participate in Ms. Thompson's trial, so Jennifer Weems, an alternate deputy city attorney, filled in. (Doc. 57-1 at 46; doc. 68-3 at 3 ¶ 9). Ms. Weems determined that the DUI citation improperly indicated that Ms. Thompson was under the influence of both alcohol <u>and</u> controlled substances, and entered a plea agreement with Ms. Thompson under which she pleaded guilty to other infractions in exchange for a *nolle prosequi*[1] on the DUI and insurance charges. (Doc. 57-1 at 46–47; doc. 57-3 at 1).

Mr. Odom did not agree with Ms. Weems's decision. (Doc. 57-1 at 58). Mr. Odom moved to reinstate the DUI charge against Ms. Thompson, which he was able to do because an offense that is *nolle prossed* can be recharged before the statute of limitations period passes. (Doc. 68-3 at 4 ¶ 11). The municipal court judge approved the request, the arresting officer issued a new citation, and Ms. Thompson was eventually found guilty of DUI. (Doc. 57-3 at 1, 12–14, 20; doc. 68-3 at 4 ¶¶ 11–12).

---

[1] *Nolle prosequi* is "[a] legal notice that a lawsuit or prosecution has been abandoned." Nolle Prosequi, Black's Law Dictionary (11th ed. 2019).

In 2018, the city council appointed a new city manager. (*See* doc. 57-6 at 100 ¶ 2). Mr. Ray and Mr. Little each "individually" continued to demand that the city manager replace Mr. Odom with an African American. (*Id.* at 100–01 ¶ 5).

In June 2019, the City Council appointed Defendant Steven Folks to serve as interim city manager. (Doc. 61-1 at 1 ¶ 3). In the weeks following the interim appointment, Mr. Folks told Mr. Odom he "was doing a great job," and Mr. Folks was not "going to make [any] changes." (Doc. 57-1 at 19). That same month, Mr. Ray helped Ms. Thompson file bar complaints against Mr. Odom and her attorney for their handling of her prosecution. (Doc. 57-9 at 32, 60–70; *see* doc. 57-7 at 107–110). Meanwhile, Mr. Ray and Mr. Little continued to voice concerns about the prosecution at city council meetings. (Doc. 57-6 at 17–18). Mr. Folks understood that Mr. Ray and Mr. Little thought Mr. Odom did not treat Ms. Thompson fairly because she is African American. (Doc. 56-7 at 18).

In September 2019, Mr. Folks met with Mr. Odom, the municipal court judge, and others regarding Ms. Thompson's case. (Doc. 57-1 at 20; doc. 57-6 at 18). Mr. Folks explained that he did not fully agree with how Mr. Odom handled the matter, but he understood that Mr. Odom's actions were legal. (Doc. 57-1 at 58; Doc. 57-6 at 19). Thereafter, Mr. Odom attended a city council work session to present information about Ms. Thompson's prosecution in response to Mr. Ray and Mr. Little's complaints about the case. (Doc. 57-1 at 20). Around this time, the city

council made Mr. Folks's appointment as city manager permanent. (Doc. 57-6 at 50; doc. 61-1 at 1 ¶ 3).

Mr. Ray and Mr. Little's criticism of Mr. Odom did not stop. Throughout the fall of 2019, Mr. Ray and Mr. Little spoke at city council meetings and work sessions and urged Mr. Folks to replace Mr. Odom. (Doc. 57-7 at 41, 63; doc. 57-9 at 7–9, 15–18, 21). Mr. Little also sent two emails to Mr. Folks and other City officials complaining about municipal court operations and requesting that the City replace the municipal court judge and Mr. Odom. (Doc. 57-7 at 100–01). During one or more city council meetings, Mr. Little accused the deputy city attorney of falsifying documents and urged the City Council to make "changes in the municipal court to include the judges and attorneys that were there." (Doc. 57-7 at 41; *id.* at 29–31).

In January 2020, Mr. Folks terminated Mr. Odom's appointment as deputy city attorney. (Doc. 57-1 at 20). Mr. Folks told Mr. Odom that he "was going to go in a different direction." (*Id.* at 21). Mr. Folks provided Mr. Odom with a letter commending Mr. Odom for his work and explaining that Mr. Odom had served the City "admirably," but that Mr. Folks intended "to move in a different direction in [the] selection of [the] Deputy City Attorney going forward." (Doc. 57-2 at 5). During their meeting, Mr. Folks told Mr. Odom that he intended to rotate the deputy city attorney and public defender positions every two years. (Doc. 57-1 at 21; doc.

57-6 at 24). When Mr. Odom asked if he could reapply for the position, Mr. Folks told him he could not at that time. (Doc. 57-1 at 21).

Mr. Folks testified that he did not know of any deficiencies in Mr. Odom's performance, conduct, or behavior. (Doc. 57-6 at 16). He made his decision to terminate Mr. Odom's employment, in part, because of the complaints that he heard about Mr. Odom and municipal court during the public comment period of city council meetings. (Doc. 57-6 at 22–23; doc. 61-1 at 3 ¶¶ 16–17). Those complaints included that the municipal court judge and Mr. Odom may treat African Americans differently than others who appeared in court and concerns about Ms. Thompson's prosecution. (Doc. 57-6 at 17–18; doc. 61-1 at 3 ¶ 16). Mr. Folks testified that numerous people voiced concerns and complaints, but the only individuals he could specifically recall were Mr. Little, Mr. Ray, and Ms. Thompson. (Doc. 57-6 at 23).

The day after Mr. Odom's termination, his attorney sent a letter to Mr. Folks and the mayor of Anniston alleging that Mr. Odom was fired because of his race and age. (Doc. 57-6 at 104–05). The letter explained that Mr. Odom understood the "different direction" that Mr. Folks planned to take included terminating the public defender, who, like Mr. Odom, was over the age of forty. (*Id.* at 104).

In February 2020, Mr. Folks posted the deputy city attorney position in the local newspaper and on the City's website and social media page. (Doc. 57-6 at 29–30; doc. 61-1 at 4 ¶ 20). Three individuals applied, including Mr. Odom and his

predecessor. (Doc. 57-6 at 33; doc. 61-1 at 4 ¶ 23). All of the applicants were Caucasian. (Doc. 57-1 at 12, 41; doc. 61-1 at 4 ¶ 23). Mr. Folks interviewed only one of the applicants because the other two had worked as deputy city attorney and rehiring them would not achieve his objective of "moving in a different direction and obtaining a new perspective." (Doc 57-6 at 32; doc. 61-1 at 4 ¶ 22). However, Mr. Folks did not offer the job to the applicant he interviewed. (Doc. 57-6 at 39–41; doc. 68-1 at 2–3 ¶¶ 5–6).

Shortly after Mr. Folks interviewed the one applicant, the municipal court temporarily discontinued hearings and trials because of the COVID-19 pandemic. (Doc. 61-1 at 5 ¶ 26). When the court re-opened on a limited basis in late May 2020, Mr. Folks resumed efforts to fill the deputy city attorney position. (Doc. 61-1 at 5 ¶¶ 26–27). This time, unsatisfied with the results of advertising for the position, he attempted to recruit Jacquelyn Smoke, an attorney Mr. Folks knew. (Doc. 57-6 at 33; doc. 61-1 at 5 ¶ 27). Ms. Smoke is African American and six or seven years older than Mr. Odom. (Doc. 57-1 at 26; *see* doc. 64-1 at 1 ¶ 1; doc. 57-6 at 136). Ms. Smoke was not interested in the job at that time. (Doc. 57-6 at 34; doc. 64-1 at 3 ¶ 9).

In July 2020, Mr. Odom filed an Equal Employment Opportunity Commission ("EEOC") charge, alleging that the City discriminated and retaliated against him based on his race and age by terminating his employment as deputy city

attorney and by telling him he could not reapply for the position that remained vacant six months later. (Doc. 57-6 at 136). The City responded to Mr. Odom's EEOC in late August 2020, stating "[Mr.] Odom was not informed that [he] could not reapply." (Doc. 57-76 at 140). The City also explained that the deputy city attorney position remained vacant because the City received few applications and because of the COVID-19 pandemic, but the City neglected to acknowledge that Mr. Folks had contacted Ms. Smoke. (*Id.* at 138, 140).

After the EEOC complaint and a change in Ms. Smoke's circumstances, Mr. Folks asked Ms. Smoke to apply once again. (Doc. 57-6 at 36; doc. 64-1 at 3 ¶ 10). Mr. Folks ultimately offered her the job for a two-year term. (Doc. 57-6 at 142). Mr. Folks testified that his intent was to either post the deputy city attorney position at the conclusion of Ms. Smokes' two-year term, or reevaluate and extend the initial term if he felt municipal court was operating better. (Doc. 57-6 at 44, 51).

Notwithstanding Mr. Folks's stated intention to replace the public defender as well, the public defender at the time of Mr. Odom's termination remains in his position. (Doc. 57-6 at 23). According to Mr. Folks, he decided to delay making that replacement to ensure continuity at the municipal court. (Doc. 57-6 at 24).

## II.   DISCUSSION

The defendants move for summary judgment on all claims asserted against them. (Docs. 58, 60, 62). In deciding a motion for summary judgment, the court must

determine whether, accepting the evidence in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Hellums*, 945 F.3d at 1148. "[T]here is a genuine issue of material fact if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." *Looney v. Moore*, 886 F.3d 1058, 1062 (11th Cir. 2018) (quotation marks omitted).

Mr. Odom asserts that the City violated Title VII, § 1981, and the ADEA (Counts One through Six); that the City and Mr. Folks violated his right to equal protection (Count Fourteen); and that Mr. Ray and Mr. Little conspired to violate his right to equal protection (Count Thirteen). He also asserts various state law claims against Mr. Little and Mr. Ray (Counts Seven through Twelve). The court begins its analysis with the federal claims. The court then considers the state law claims.

### 1.   Title VII and ADEA Claims Against the City

In Counts One, Three, Four, and Six, Mr. Odom asserts claims against the City for race discrimination and retaliation in violation of Title VII and age discrimination and retaliation in violation of the ADEA. (Doc. 23 at 18–29).

Title VII and the ADEA apply only to employees, not independent contractors. *Cobb v. Sun Papers, Inc.*, 673 F.2d 337, 341–42 (11th Cir. 1982); *Daughtrey v. Honeywell, Inc.*, 3 F.3d 1488, 1495 n.13 (11th Cir. 1993). The City argues that it is entitled to summary judgment on Mr. Odom's Title VII and ADEA

15

claims because Mr. Odom was an independent contractor and not an "employee" entitled to protection under Title VII and the ADEA. (Doc. 66 at 27–32). Title VII and the ADEA define "employee" as "an individual employed by an employer," subject to narrow exceptions not relevant here. 42 U.S.C. § 2000e(f); 29 U.S.C. § 630(f). Given the limited statutory definition, the Eleventh Circuit has applied various tests to determine whether an individual is an employee or an independent contractor for purposes of the statutes. In Title VII cases, a hybrid "economic realities test" governs. *Cobb*, 673 F.2d at 341. Under this test, "the economic realities of the relationship viewed in light of the common law principles of agency and the right of the employer to control the employee . . . are determinative." *Id.* The Eleventh Circuit has not determined whether *Cobb's* hybrid test or the common law agency controls in the ADEA context but has applied both. *See Garcia*, 104 F.3d 1256, 1266–67 (11th Cir. 1997); *Daughtrey*, 3 F.3d at 1495–96.

Under the *Cobb* test, the court's analysis begins by analyzing the extent of a purported "employer's right to control the 'means and manner' of the worker's performance." *Cobb*, 673 F.2d at 340 (quotation marks omitted). "If an employer has the right to control and direct the work of an individual, not only as to the result to be achieved, but also as to the details by which that result is achieved, an employer/employee relationship is likely to exist." *Id.* (quotation marks omitted).

When evaluating the right to control, the court also considers common law agency principles including:

> (1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the "employer" or the individual in question furnishes the equipment used and the place of work; (4) the length of time during which the individual has worked; (5) the method of payment, whether by time or by the job; (6) the manner in which the work relationship is terminated; i.e., by one or both parties, with or without notice and explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the "employer"; (9) whether the worker accumulates retirement benefits; (10) whether the "employer" pays social security taxes; and (11) the intention of the parties.

*Id.* at 340.

Here, the City did not control the means and manner of Mr. Odom's performance as deputy city attorney. The City generally required Mr. Odom or someone he hired to appear in municipal court every Wednesday. (Doc. 57-1 at 12–14; doc. 57-6 at 84). But when Mr. Odom could not appear, he could instead select and compensate an alternate deputy city attorney to appear for him. (Doc. 57-1 at 12–16). He also prepared for hearings and conducted legal research on his own schedule. (Doc. 57-1 at 13). And as Ms. Thompson's case shows, he had discretion and autonomy with respect to decisions he made about the prosecution of certain charges. (*See* doc. 68-3 at 3–4 ¶¶ 8–11).

Mr. Odom argues that questions of fact exist about whether he was a City employee because the City gave him a badge that referred to him as an employee;

the City set Mr. Odom's hours and required him to perform duties in municipal court; the City paid for some of Mr. Odom's training and professional memberships; the City offered him use of an iPad; and Mr. Folks's predecessor testified that he considered Mr. Odom to be employee. (Doc. 69 at 30; *see* doc. 57-1 at 16–17; doc. 57-6 at 90–91, 100 ¶ 3; doc. 68-3 at 3 ¶ 6). The only evidence that Mr. Odom cites relevant to the degree of control the City had over his job performance is that the City set his hours and required him to perform duties in municipal court. But as explained above, when Mr. Odom could choose not to appear for municipal court dockets on Wednesdays; he could select an alternate deputy city attorney to prosecute cases in his absence. In addition, the City did not control the manner or means over how Mr. Odom prepared for municipal court or how he performed his municipal court duties. The remaining evidence upon which Mr. Odom relies does not demonstrate that the City had "the right to control and direct" Mr. Odom's work "as to the result to be achieved" or "the details by which that result is achieved." *See Cobb*, 673 F.2d at 340.

Likewise, the majority of the common law agency principles demonstrate Mr. Odom was an independent contractor. First, there is no evidence that Mr. Odom performed his work under the direction of a supervisor. (Doc. 57-6 at 8, 50, 52). As an attorney, Mr. Odom was required to attend law school and maintain an active bar

license. (Doc. 57-1 at 7–8). Therefore, he had independent skill and knowledge to perform his job.

Mr. Odom used his personal laptop and cell phone while performing his work. (Doc. 57-1 at 14; doc. 68-3 at 3 ¶ 6). The City paid Mr. Odom a set amount each month for his services in municipal court and an hourly rate by the job for other work he performed in his deputy city attorney role. (Doc. 57-1 at 16–17; doc. 57-2 at 3–4). Mr. Odom was responsible for paying all office overhead costs and expenses; he also had to compensate his substitute if he could not appear in court. (Doc. 57-1 at 12–17; doc. 57-2 at 3–4). There is no evidence the City provided annual leave or retirement benefits. And the City did not pay Mr. Odom's social security taxes; instead, it issued his law firm a Form 1099 for all compensation he received. (Doc. 61-1 at 2 ¶ 10).

Although Mr. Odom testified that he considered himself an employee and had a badge that identified himself as an employee, his engagement letter does not identify him as an employee, and he did not return his badge to the City as other City employees do upon termination. (Doc. 57-2 at 3–4; doc. 61-2 at 2–3 ¶ 9; doc. 68-3 at 2 ¶¶ 2–4).

No reasonable juror could find that Mr. Odom was an employee under either the hybrid test or the common law agency test. Because Mr. Odom was an independent contractor and not an employee, his Title VII and ADEA claims fail as

a matter of law, and the court **WILL GRANT** summary judgment in favor of the City and against Mr. Odom on Counts One, Three, Four, and Six.

2.    Section 1981 Discrimination Claim Against the City

In Count Two, Mr. Odom alleges that the City discriminated against him because of his race in violation of § 1981 by terminating his appointment as deputy city attorney and failing to rehire him for the vacant position. (Doc. 23 at 20–21).

Section 1981 prohibits intentional discrimination "in private employment on the basis of race." *Johnson v. Ry. Express Agency*, 421 U.S. 454, 459–60 (1975). As a general rule, § 1981 claims "are subject to the same standards of proof and employ the same analytical framework" as Title VII claims. *Bryant v. Jones*, 575 F.3d 1281, 1296 n.20 (11th Cir. 2009).

A plaintiff may prove a claim of intentional discrimination through direct, circumstantial, or statistical evidence. *Rioux v. City of Atlanta*, 520 F.3d 1269, 1274 (11th Cir. 2008). Mr. Odom has not offered any direct or statistical evidence of discriminatory intent, so the only issue in this case is whether he has presented sufficient circumstantial evidence for a reasonable jury to find intentional discrimination based on his race. A plaintiff can satisfy this burden through various forms of circumstantial evidence. *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). Here, Mr. Odom relies exclusively on the test set out in the

Supreme Court's decision in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). (Doc. 69 at 23–27).

Under the *McDonnell Douglas* test, a plaintiff must first establish a *prima facie* case "by showing (1) that [he] belongs to a protected class, (2) that [he] was subjected to an adverse employment action, (3) that [he] was qualified to perform the job in question, and (4) that [his] employer treated similarly situated employees outside [his] class more favorably." *Lewis v. City of Union City*, 918 F.3d 1213, 1220–21 (11th Cir. 2019) (en banc). If a plaintiff makes this initial showing, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for its adverse employment action. *Id*. at 1221. If a defendant sustains its burden to put forth legitimate, non-discriminatory reasons for its actions, the plaintiff must demonstrate that the proffered reasons were pretext for unlawful discrimination. *Id*. To do so, a plaintiff must show "*both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (emphasis in original).

The City argues that it is entitled to summary judgment on Mr. Odom's § 1981 race discrimination claims because he cannot establish a *prima facie* case of discrimination or that the City's legitimate, non-discriminatory reasons for its actions are pretext for discrimination. (Doc. 66 at 32–37).

a.     *Prima Facie Case*

The City argues that Mr. Odom cannot establish a *prima facie* case of race discrimination because Ms. Smoke was not less qualified than Mr. Odom for the deputy city attorney position. (Doc. 66 at 33–34). But Mr. Odom's and Ms. Smoke's relative qualifications are irrelevant at the *prima facie* stage. *Walker v. Mortham*, 158 F.3d 1177, 1185-92 (11th Cir. 1998). Therefore, the City's sole argument with respect to Mr. Odom's burden of showing a *prima facie* case of race discrimination is not persuasive, and the City has forfeited any other argument on this issue. *See United States v. Campbell*, 26 F.4th 860, 890 (11th Cir. 2022) (explaining that a party forfeits an argument or issue "when a party fails to raise an argument or issue in its brief").

b.     *Legitimate Non-Discriminatory Reasons and Pretext*

The City next argues that even if Mr. Odom could establish a *prima face* case of race discrimination, he cannot show that the City's proffered reasons for terminating his position and failing to rehire him are pretext.

i.     **Termination**

The City asserts that it terminated Mr. Odom's appointment as deputy city attorney because Mr. Folks chose "to go in a different direction" with the deputy city attorney position. (Doc. 66 at 34; *see* doc. 57-6 at 22; doc. 57-2 at 5). Because the City has carried its burden of producing a legitimate non-discriminatory reason for

its decision to terminate Mr. Odom's appointment, the burden shifts to Mr. Odom to present evidence from which a reasonable fact finder could conclude that the articulated reason is pretext for unlawful discrimination. *Smith*, 644 F.3d at 1326.

Mr. Odom argues that a reasonable jury could find that the City's proffered reason for its decision to terminate his appointment is pretext because Mr. Odom performed his job well, had no disciplinary issues, and Mr. Folks indicated in June 2019 that he did not intend to make any changes. (Doc. 69 at 25; *see also* doc. 57-1 at 19; doc. 57-6 at 16). Therefore, according to Mr. Odom, a jury could infer that the only reason for the City to want to change directions was Mr. Little's and Mr. Ray's urgings to terminate Mr. Odom. (*Id.*). Mr. Odom also contends that a reasonable jury could find that the City fired him because of his race because now that an African American holds the deputy city attorney position, the City does not plan on rotating the position every two years. (Doc. 69 at 25; *see also* doc. 57-6 at 51).

The court agrees with Mr. Odom that this evidence demonstrates sufficient "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the City's proffered reason for terminating Mr. Odom that a reasonable jury could infer that Mr. Odom's race was the real reason for its decision. *See Holland v. Gee*, 677 F.3d 1047, 1055 (11th Cir. 2012).

### ii.    Failure to Rehire

The City contends that it did not rehire Mr. Odom for the vacant deputy city attorney position because doing so would not achieve Mr. Folks's objective of moving in a different direction and obtaining a new perspective. (Doc. 66 at 34–35; doc. 61-1 at 4 ¶ 22). This is a legitimate, non-discriminatory reason, so the burden shifts to Mr. Odom to show the proffered reason is pretext for unlawful discrimination. *See Smith*, 644 F.3d at 1326.

Mr. Odom argues that a jury could infer that race discrimination was the real reason Mr. Folks did not rehire him because the City advanced false information for its actions. (Doc. 69 at 25–26). First, Mr. Odom cites the City's false statement in its response that it did not tell Mr. Odom he could not re-apply for the deputy city attorney position. (*Id.* at 26). In fact, Mr. Folks had told Mr. Odom he could not reapply for the position at the time. (Doc. 57-6 at 140). But the stated reason for not rehiring Mr. Odom to that same position is that doing so would not promote Mr. Folks's goal of changing directions and bringing in an outside perspective. The alleged inaccuracies in the City's response to Mr. Odom's EEOC charge about whether he could reapply for the position is not a false reason for the City's actions.

Mr. Odom also argues that a reasonable juror could infer that Mr. Odom's race was the real reason the City did not re-hire him because the City omitted from its EEOC response the fact that Mr. Folks contacted Ms. Smoke in the spring of 2020

to gauge her interest in the deputy city attorney position when explaining that position remained vacant due to limited applications and the COVID-19 pandemic. (Doc. 69 at 26; *see* doc. 57-6 at 140). This argument is persuasive.

As Mr. Odom explains, rather than hiring one of the three Caucasians who applied for the deputy city attorney position in response to the public posting for the job in February 2020, the City kept the position vacant for several months. (Doc. 69 at 25). Mr. Folks then contacted an African American who initially declined to be considered for the position. (Doc. 57-6 at 33–34; doc. 61-1 at 5 ¶; doc. 64-1 at 3 ¶ 9). Without making additional efforts to hire a new deputy city attorney or expand the applicant pool, Mr. Folks contacted that same candidate—and only that candidate— to gauge her interest again. (*Id.*; *see also* doc. 57-6 at 36; doc. 64-1 at 3 ¶ 10). And Mr. Folks did so after Mr. Little and Mr. Ray complained that Mr. Odom had treated African Americans unfairly in municipal court and publicly called for the City to replace him with an African American. (Doc. 57-6 at 17–18; doc. 57-7 at 41, 100– 01; doc. 57-9 at 7–9, 15–18, 21; doc. 61-1 at 3 ¶ 16). The court finds that Mr. Folks's concerted effort to select an African American candidate under these circumstances is evidence from which a jury could conclude that the City did not rehire Mr. Odom because he is Caucasian.

Because the evidence creates triable issues of fact about whether the City's proffered reasons for terminating Mr. Odom and not rehiring him are pretext for

unlawful race discrimination, the court **WILL DENY** the City's motion for summary judgment on Count Two.

    <u>3.</u>    <u>Section 1981 Retaliation Claim Against the City</u>

In Count Five, Mr. Odom alleges the City retaliated against him in violation of § 1981 by failing to rehire him for the vacant deputy city attorney position because of his complaints of race discrimination contained in his letter to the City after his termination. (Doc. 23 at 23–25).

Retaliation claims under § 1981 are analyzed under the same framework as Title VII claims" using the *McDonnell Douglas* burden shifting framework. *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1134–35 (11th Cir. 2020) (en banc). To establish a *prima facie* case of retaliation, a plaintiff must first establish a *prima facie* case by showing: (1) that he "engaged in statutorily protected activity," (2) that he "suffered an adverse action," and (3) "that the adverse action was causally related to the protected activity." *Id.* at 1134 (quotation marks omitted). If the plaintiff does so, the defendant must "articulate a legitimate, non-retaliatory reason" for its decision. *Id.* at 1136. If the defendant sustains its burden, then "to defeat summary judgment," the plaintiff must demonstrate both that the defendant's reason was pretext for unlawful retaliation and that "but for" the plaintiff's protected conduct, the defendant would not have taken an adverse action. *Id.*

The City concedes for purposes of summary judgment that Mr. Odom can demonstrate a *prima facie* case of retaliation under § 1981. (Doc. 66 at 39). The City argues that it is entitled to summary judgment on Mr. Odom's §1981 retaliation claim because he cannot rebut the City's legitimate, nonretaliatory reason for failing to rehire him: that doing so would not have accomplished Mr. Folks's goal of moving in a different direction and obtaining a new perspective in the position. (*Id.* at 39–40; *see also* doc. 61-1 at 4 ¶ 22).

With respect to his § 1981 retaliation claim, Mr. Odom argues that a reasonable jury could conclude that the City's decision not to rehire him is pretext for unlawful race retaliation for the same reasons he offered in support of § 1981 race discrimination claim. (Doc. 69 at 31). Although, as explained above, this evidence is sufficient to establish pretext for purposes of Mr. Odom's § 1981 discrimination claim, the court finds that this evidence does not help Mr. Odom carry his burden of providing "evidence from which one could reasonably conclude that but for" his complaint of race discrimination, the City would not have rehired him. *See Gogel*, 967 F.3d at 1138. Mr. Odom's brief does not acknowledge or advance any argument on this point. And before he complained that his termination was discriminatory, Mr. Folks had already told Mr. Odom that he could not reapply at that time for the vacant position. (Doc. 57-1 at 21). That comment is consistent with the City's explanation that it did not rehire Mr. Odom because doing so would not

have advanced Mr. Folks's intention to take the position in a different direction. Therefore, the court finds that no reasonable juror could conclude that Mr. Odom would not have been rehired but for his complaint of race discrimination.

Accordingly, the court **WILL GRANT** summary judgment in favor of the City and against Mr. Odom on Count Five.

> ## 2.   Section 1983 Equal Protection Claim Against the City and Mr. Folks

In Count Fourteen, Mr. Odom asserts a claim under § 1983 against the City and Mr. Folks for denial of his equal protection rights in violation of the Fourteenth Amendment when they made the decision to terminate his appointment as deputy city attorney and failed to rehire him. (Doc. 23 at 37–38 ¶¶ 258, 260).

The City and Mr. Folks construe Count Fourteen as asserting another[2] claim under § 1983 for violations of Mr. Odom's § 1981 statutory rights. (Doc. 66 at 40, 42; doc. 77 at 10). While Count Fourteen contains a stray paragraph alleging that the City and Mr. Folks violated his § 1981 right to be free from unlawful race discrimination and retaliation (doc. 23 at 38 ¶ 259), both the substance of the claim and Mr. Odom's response in opposition to summary judgment demonstrate that Count Fourteen asserts a claim for a violation of his rights secured by the Fourteenth Amendment. (*Id.* at 23 ¶ 258; doc. 69 at 32–33). The court therefore finds that Count

---

[2] Count Two of the amended complaint asserts a claim under § 1983 for race discrimination in violation of § 1981. (Doc. 23 at 20–21).

Fourteen asserts a claim for violations of Mr. Odom's Fourteenth Amendment equal protection rights.

The City and Mr. Folks both argue that they are entitled to qualified immunity and that Mr. Odom's equal protection claim "fails for the same reasons set forth in the preceding sections" of their brief. (Doc. 66 at 40–42). Those sections, which address Mr. Odom's § 1981 discrimination claims, apply with equal force to Mr. Odom's § 1983 equal protection claim. *See Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1312 n.6 (11th Cir. 2018) ("Employment discrimination claims against state actors for violation of the Equal Protection Clause are cognizable under § 1983, and are subject to the same standards of proof and use the same analytical framework as discrimination claims brought under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981."). Therefore, the court will proceed with its analysis of whether the defendants are qualifiedly immune from liability arising from any violation of Mr. Odom's equal protection rights and whether the claim fails as a matter of law.

The City is not qualifiedly immune from damages because the defense is available only to Mr. Folks. *See Owen v. City of Independence*, 445 U.S. 622, 638 (1980) ("We hold, therefore, that the municipality may not assert the good faith of its officers or agents as a defense to liability under § 1983."); *cf. Chua v. Ekonomou*, 1 F.4th 948, 956 (11th Cir. 2021) ("Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct does not

violate clearly established statutory or constitutional rights of which a reasonable person would have known.") (quotation marks omitted). And because Mr. Odom has rebutted the legitimate, non-discriminatory reasons for the City's decisions, a jury could find that the City violated his equal protection rights.

As for Mr. Folks, to be qualifiedly immune from damages, Mr. Folks need only demonstrate that "he acted within his discretionary authority." *Powell v. Snook*, 25 F.4th 912, 920 (11th Cir. 2022) (quotation marks omitted). Here, Mr. Odom concedes that Mr. Folks was acting in the scope of his discretionary authority at the time of the alleged constitutional violation. (Doc. 69 at 32). Therefore, the burden shifts to Mr. Odom to show both that Mr. Folks violated his constitutional rights and that the rights were "clearly established at the time of the alleged violation." *Robinson v. Sauls*, 46 F.4th 1332, 1340–41 (11th Cir. 2022) (quotation marks omitted).

Again, because Mr. Odom has rebutted the legitimate, non-discriminatory reasons for the City's decisions, a reasonable jury could find that Mr. Folks violated his equal protection rights when he terminated his appointment as deputy city attorney and failed to rehire him for the position. In addition, for purposes of Mr. Folks's qualified immunity defense, Mr. Odom has shown that Mr. Folks violated a clearly established right by terminating him because of his race. (Doc. 69 at 32–33); *see Smith v. Lomax*, 45 F.3d 402, 407 (11th Cir. 1995) ("We need not engage in a

lengthy discussion of the patently obvious illegality of racial discrimination in public employment."); *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1478 (11th Cir. 1991) ("It is beyond doubt that the principal right allegedly violated by the defendants—the equal protection right to be free from intentional racial discrimination—was clearly established" in 1986).

Therefore, the court **WILL DENY** the City and Mr. Folks's motion for summary judgment on Count Fourteen.

 3. <u>Section 1985(3) Conspiracy Claim Against Mr. Little and Mr. Ray</u>

In Count Thirteen, Mr. Odom alleges that Mr. Little and Mr. Ray conspired together and with Mr. Folks to have him terminated because of his race, depriving him of equal protection of the laws. (Doc. 23 at 35–37). The court previously dismissed the § 1985(3) conspiracy claim against Mr. Folks for failure to state a claim. (Doc. 47). Therefore, the remaining claim is that Mr. Little and Mr. Ray conspired with each other to have Mr. Odom terminated.

"Section 1985 provides a vehicle to redress conspiracies to interfere with civil rights." *Farese v. Scherer*, 342 F.3d 1223, 1230 (11th Cir. 2003). To establish a conspiracy under § 1985(3), a plaintiff must demonstrate (1) the existence of a conspiracy; (2) for the purpose of depriving "any person or class of persons of the equal protections of the laws, or of equal privileges and immunities under the laws";

(3) an act in furtherance of the conspiracy; and (4) an injury. *Denney v. City of Albany*, 247 F.3d 1172, 1190 (11th Cir. 2001) (quotation marks omitted).

> a.    Mr. Little

Mr. Little argues that he is entitled to summary judgment on Mr. Odom's conspiracy claim because: (1) Mr. Odom cannot establish the elements of the conspiracy claim against him, and (2) he is entitled to qualified immunity. (Doc. 65 at 29–35). As explained below, Mr. Odom has not shown that Mr. Little violated a clearly established right, so he is qualifiedly immune from Mr. Odom's § 1985 claim. Therefore, the court does not consider Mr. Little's first argument.

To show he is entitled to qualified immunity, Mr. Little need only "establish that the allegedly unconstitutional conduct occurred while he was acting within the scope of his discretionary authority." *Est. of Cummings v. Davenport*, 906 F.3d 934, 940 (11th Cir. 2018). Mr. Little has done so. Mr. Odom alleges that Mr. Little conspired with Mr. Ray by making public comments about Mr. Odom and making public calls for his termination. (Doc. 23 at 36 ¶ 255). All of these acts were "undertaken pursuant to the performance" of Mr. Little's duties and within his authority as a city council member. *Est. of Cummings*, 906 F.3d at 940 (quotation marks omitted). Mr. Odom contends that Mr. Little was not acting within his discretionary authority because Mr. Little "had no authority to make any decisions relating to" Mr. Odom's position with the City. (Doc. 71 at 33). That may be. But

Mr. Odom's claim is not that Mr. Little terminated him from his position; Mr. Odom claims Mr. Little conspired with Mr. Ray to "have [Mr. Odom] terminated from his role" because of his race. (Doc. 23 at 36 ¶ 253). And all of the acts alleged to have formed part of that conspiracy took place within Mr. Little's authority as a city council member.

Because Mr. Little has demonstrated that he was acting in the scope of his discretionary authority, the burden shifts to Mr. Odom to show that Mr. Little violated Mr. Odom's constitutional rights and that the rights were "clearly established at the time of the alleged violation." *Robinson v. Sauls*, 46 F.4th 1332, 1340–41 (11th Cir. 2022) (quotation marks omitted). Mr. Odom must satisfy both requirements and the court may analyze them in either order. *Bradley v. Benton*, 10 F.4th 1232, 1238 (11th Cir. 2021). Assuming without deciding that Mr. Little violated Mr. Odom's constitutional rights, Mr. Odom has not shown the rights were clearly established.

"Clearly established means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Williams v. Aguirre*, 965 F.3d 1147, 1168 (11th Cir. 2020) (quotation marks omitted). There are three ways a plaintiff can show a violation of a clearly established right. *Echols v. Lawton*, 913 F.3d 1313, 1324 (11th Cir. 2019). First, he can cite a "materially similar case that has already been decided." *Id.*

(quotation marks omitted; alteration adopted). Second, he can point to "a broader, clearly established principle that should control the novel facts of the situation." *Id.* (quotation marks omitted). Finally, "the conduct involved in the case may so obviously violate the Constitution that prior case law is unnecessary." *Id.* (quotation marks omitted; alteration adopted).

Under the first method, Mr. Odom may cite "materially similar" precedent from the United States Supreme Court, Eleventh Circuit, or Alabama Supreme Court that bear a "close factual fit" to the facts of this case. *Cantu*, 974 F.3d at 1232. The materially similar case need not be "directly on point, but existing precedent must have placed the . . . constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011); *Baxter v. Roberts*, 54 F.4th 1241, 1263 (11th Cir. 2002) ("The key question is whether the factual scenario that the official faced is fairly distinguishable from the circumstances facing the official in the first case.") (quotation marks omitted).

In the absence of case law that satisfies that standard, Mr. Odom may "show that a broader, clearly established principle should control the novel facts of a particular case." *Davis v. Waller*, 44 F.4th 1305, 1312 (11th Cir. 2022), petition for cert. denied (U.S. May 1, 2023) (No. 22-793). But the legal principle must "clearly prohibit the officer's conduct in the particular circumstances before him." *Baxter*,

54 F.4th at 1268 (cleaned up; emphasis added). For both the first and second methods, Mr. Odom "must rely on decisional law." *Powell*, 25 F.4th at 920.

Citing *Smith v. Lomax*, 45 F.3d 402 (11th Cir. 1995), *Yeldell v. Cooper Green Hosp., Inc.*, 956 F.2d 1056 (11th Cir. 1992), and *Washington v. Davis*, 426 U.S. 229 (1976), Mr. Odom submits that "[w]hen the events forming the basis of this lawsuit took place in 2019 and 2020, the law was clearly established that intentional discrimination in employment on the basis of race violates federal law." (Doc. 71 at 33). None of these cases satisfy Mr. Odom's burden of showing a violation of clearly established law under the first or second method.

In *Smith*, a county board of commissioners voted to replace its Caucasian clerk with an African American. 45 F.3d at 403. In relevant part, the former clerk filed suit under § 1983 alleging that the individual county commissioners denied her equal protection of the laws under the Fourteenth Amendment by voting to replace her because of her race. *Id.* The commissioners conceded for purposes of summary judgment that they did not reappoint the plaintiff solely because she was Caucasian, but they argued they were entitled to judgment as a matter of law because their actions did not violate a clearly established right. *Id.* at 404, 406. The Eleventh Circuit found that the commissioners were not entitled to qualified immunity because "[g]iven the clear state of the law prohibiting racial discrimination in public employment" when the board of commissioners voted to replace the plaintiff, "no

reasonable commissioner . . . would have believed that his or her discriminatory actions were constitutional." *Smith*, 45 F.3d at 407.

Published by the Eleventh Circuit three years before *Smith*, *Yeldell* involved, in relevant part, claims that county commissioners violated county employees' equal protection rights by voting to terminate and demote the employees because of their race. *Yeldell*, 956 F.2d at 1059. The Eleventh Circuit held that certain commissioners were entitled to summary judgment on unrelated grounds, and for the remaining commissioner found that the record created questions of fact about whether he violated clearly established law. *Id.* at 1064. The Court reiterated a previous holding that the equal protection right to be free from intentional race discrimination in the public workplace was clearly established and found that the remaining commissioner was not entitled to qualified immunity because questions of fact existed about whether he engaged in intentional discrimination in hiring and firing of the county employees. *Id.* (citing *Brown*, 923 F.2d at 1478).

*Smith* and *Yeldell* are not factually similar to this case, and neither establishes a general principle that controls the novel facts of this case. In both *Smith* and *Yeldell*, plaintiffs asserted § 1983 equal protection claims against the individuals who actually made the personnel decisions at issue. *Smith*, 45 F.3d at 403; *Yeldell*, 956 F.2d at 1059. In both cases, the Eleventh Circuit held it was clearly established that an official who votes to fire a public employee because of that employee's race

36

violates that individual's equal protection rights and is liable under § 1983. *Smith*, 45 F.3d at 407; *Yeldell*, 956 F.2d at 1064. But neither *Smith* nor *Yeldell* would have put Mr. Little on notice that he was violating Mr. Odom's clearly established rights.

There is no evidence that Mr. Little or Mr. Ray had authority over any personnel decision involving Mr. Odom; that authority belonged to Anniston's city manager. (Doc. 57-1 at 19; doc. 57-6 at 8; doc. 57-7 at 14–16). Therefore, *Smith* and *Yeldell* could not have put Mr. Little on notice that his conspiring with another non-decisionmaker would violate the equal protection rights of an individual with whom the City had a contract to provide deputy city attorneys services, subjecting him to liability for conspiracy under § 1983(5).

Mr. Odom's reliance on *Washington* fails as well. In *Washington*, the plaintiffs unsuccessfully applied for employment with the District of Columbia's police department. 426 U.S. at 232–33. The plaintiffs filed suit alleging that the police department's recruiting procedures, including a written test, were racially discriminatory in violation of their due process rights under the Fifth Amendment, § 1981, and a section of the District of Columbia Code. *Id.* at 233. The section of the *Washington* opinion Mr. Odom cites is the United States Supreme Court's discussion of how the Court of Appeals plainly erred when, applying Title VII principles, the Court of Appeals found the facially neutral written test at issue violated the Fifth Amendment because of its discriminatory impact. (Doc. 71 at 33; citing *Washington*,

426 U.S. at 239–41). The Court found that the disproportionate effect the test had on African American applicants was insufficient, standing alone, to support the conclusion that the test was unconstitutional. *Washington*, 426 U.S. at 239–48.

In reaching that conclusion, the Court explained that "[t]he central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race." *Id.* at 239. The Court noted that the due process clause of the Fifth Amendment—the constitutional provision at issue in the case—also contained "an equal protection component prohibiting the United States from invidiously discriminating between individuals or groups." *Id.* Then, providing a number of examples, the Court stated that its cases had "not embraced the proposition that a law or other official act, without regard to whether it reflects a discriminatory purpose, is unconstitutional solely because it has a racially disproportionate impact." *Id.*; *see also Washington*, 426 U.S. at 239–41.

*Washington* is not a materially similar case because Mr. Odom's claim is not one based on application of a facially neutral recruiting policy. And to the extent *Washington* establishes a general principle that the Equal Protection Clause prohibits race discrimination, this statement of the law is too broad to have put Mr. Little on notice that he would be subject to liability under § 1985(3) for conspiring with another non-decisionmaker to seek the termination of an individual over whom they had no decision-making power.

Therefore, Mr. Odom's attempt to show that Mr. Little violated clearly established law falls short. And Mr. Odom's brief makes no attempt to show that "the unlawfulness of the conduct was readily apparent to [Mr. Little] notwithstanding the lack of case law." *Echols*, 913 F.3d at 1325 (quotation marks omitted); *see* doc. 71 at 33.

Accordingly, the court finds that Mr. Odom has not met his burden of demonstrating that Mr. Little violated a clearly established right. Thus, Mr. Little is entitled to qualified immunity on Mr. Odom's § 1985(3) conspiracy claim, and the court **WILL GRANT** summary judgment in Mr. Little's favor on Count Thirteen.

> b.    *Mr. Ray*

As a reminder, Count Thirteen, brought under 42 U.S.C. § 1985(3), asserts that "Mr. Ray, Mr. Little, and/or Mr. Folks conspired to deprive Mr. Odom of his right to be free from race discrimination as secured by the Equal Protection Clause to the United States Constitution and/or 42 U.S.C. § 1981." (Doc. 23 at 36–37 ¶ 256). Section 1985(3) provides a vehicle for plaintiffs to bring claims for conspiracy to interfere with certain rights:

> If two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person . . . of the equal protection of the laws . . . the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3).

The Supreme Court long ago held "that all indicators—text, companion provisions, and legislative history—point unwaveringly to [§] 1985(3)'s coverage of private conspiracies." *Griffin v. Breckenridge*, 403 U.S. 88, 101 (1971). But because § 1983 just as obviously was not meant "to apply to all tortious, conspiratorial interferences with the rights of others," *id.*, any cause of action brought through § 1985(3) must include "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action. The conspiracy, in other words, must aim at a deprivation of the equal enjoyment of rights secured by the law to all." *Id.* at 102 (footnote omitted). In *Griffin*, the right at issue was the right to interstate travel. *Id.* at 106. Several years later, the former Fifth Circuit held that, under *Griffin*, "there can only be a deprivation of the rights of a plaintiff when the action of the defendants is otherwise illegal"; only after showing an independent unlawful act does the court inquire into whether discriminatory animus motivated the action. *McLellan v. Miss. Power & Light Co.*, 545 F.2d 919, 925–26 (5th Cir. 1977) (en banc).[3]

In short, to bring a cause of action under § 1985(3), a plaintiff must be able to prove, in relevant part, that (1) the defendants engaged in a conspiracy; (2) the purpose of the conspiracy was to deprive him of the equal protection of the laws;

---

[3] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

(3) a conspirator took action to further the conspiracy; (4) the defendants took an independently unlawful action; (5) the defendants were motivated by discriminatory animus; and (6) "as a result, the plaintiff suffered injury to either his person or his property, or was deprived of a right or privilege of a citizen of the United States." *Jimenez v. Wellstar Health Sys.*, 596 F.3d 1304, 1312 (11th Cir. 2010); *McLellan*, 545 F.2d at 925–26.

Mr. Ray makes only two brief arguments about this claim. First, he contends that Mr. Odom cannot prove the existence of a conspiracy because Mr. Ray's and Mr. Little's complaints about Mr. Odom were made entirely separately. (Doc. 67 at 16). Second, Mr. Ray contends that "the right to be free from race discrimination under Title VII and 42 U.S.C. § 1981 cannot form the basis of a 1985(e) action against private individuals." (*Id.*) (quoting *Jimenez*, 596 F.3d at 1312).

With respect to the first argument, reasonable jurors could find the existence of a conspiracy between Mr. Ray and Mr. Little. Mr. Little and Mr. Ray both urged previous city managers to replace Mr. Odom with an African American. (Doc. 57-6 at 94 ¶¶ 7–8; doc. 57-6 at 98 ¶ 8; doc. 57-6 at 100–01, ¶ 5). One former city manager testified that he had "meetings with and communications from [Mr.] Little and [Mr.] Ray urging [him] to fire [Mr.] Odom . . . and replace him with an African American lawyer." (Doc. 57-6 at 98 ¶ 8). The same city manager testified that both Mr. Little and Mr. Ray "emphasized what they felt was a need to hire more African Americans

to work for the City." (*Id.*). In addition, during a November 15, 2019 council meeting, Mr. Ray "challenged" Mr. Folks to do something about the DUI case" and thanked Mr. Little "for helping out with these things." (Doc. 57-1 at 51). Though the evidence is hardly overwhelming, it is sufficient to create a question of fact that a jury must determine.[4] *See Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. City of Miami*, 637 F.3d 1178, 1192 (11th Cir. 2011) (quotation marks omitted) ("[A]n agreement may be inferred from the relationship of the parties, their overt acts and concert of action, and the totality of their conduct.").

Mr. Ray's second argument is brief to a fault, being contained in two sentences. (Doc. 67 at 16). He contends that because both he and Mr. Little are private individuals, Mr. Odom may only maintain a conspiracy claim based on violation of a constitutional right, and cannot maintain a conspiracy claim based on violations of Title VII and § 1981. (*Id.*). The court agrees with that argument based on binding Eleventh Circuit precedent. *See Jimenez*, 596 F.3d at 1312 ("[B]ecause conspiracies to violate rights protected by Title VII cannot form the basis of § 1985(3) suits, and because the Supreme Court has been conservative in designating

---

[4] The court notes that Mr. Odom makes an argument about an email Mr. Little allegedly forwarded to Mr. Ray. (Doc. 70 at 30; doc. 71 at 32). However, the email Mr. Odom says Mr. Little forwarded is blank, lacks a subject line, and was sent days earlier. (*See* doc. 71 at 13 ¶ 35; doc. 57-7 at 102). Moreover, Mr. Ray denies having seen the email and Mr. Odom has not presented any evidence creating a dispute about that denial. (Doc. 57-9 at 30). The court therefore does not consider the email to be evidence from which a reasonable jury could find a conspiracy between Mr. Ray and Mr. Little.

which rights litigants may enforce against private actors under § 1985(3), we hold conspiracies to violate rights protected under § 1981 are likewise insufficient to form the basis of a § 1985(3) claim.") (citation omitted). Accordingly, the court **WILL GRANT** summary judgment in favor of Mr. Ray to the extent Mr. Odom pleads a § 1985(3) claim based on § 1981. (*See, e.g.*, doc. 23 at 36–37 ¶ 256).

However, Mr. Odom also pleads a § 1985(3) conspiracy based on purported violations of his equal protection rights. (*Id.*). Mr. Ray does not acknowledge that part of the claim in either his initial brief or his reply brief. (*See* doc. 67 at 36–37; doc. 79 at 9–10). As a result, he has not carried his initial burden, at summary judgment, "of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which [he] believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quotation marks omitted). Accordingly, the court **WILL DENY** summary judgment on the § 1985(3) claim based on equal protection violations.

The court notes that, as the Supreme Court stated in *Griffin*, it is "difficult to conceive of what might constitute a deprivation of the equal protection of the laws by private persons." *Griffin*, 403 U.S. at 97. But nothing in *Griffin* or the former Fifth Circuit or Eleventh Circuit precedent that followed foreclosed a claim of

private conspiracy to violate a person's equal protection rights. *See id.*; *Jimenez*, 596 F.3d at 1312 (rejecting the plaintiff's claim that his employer conspired to violate his rights under § 1981); *McLellan*, 545 F.2d at 929–31 (rejecting the plaintiff's claim that his employer conspired to violate his rights by firing him for filing a voluntary petition for bankruptcy). Whether such a claim is viable is a question far too weighty for the court to address on its own, without the benefit of research and argument from both parties.

In sum, the court **WILL GRANT IN PART** and **WILL DENY IN PART** Mr. Ray's motion for summary judgment on Count Thirteen. The court **WILL GRANT** summary judgment in favor of Mr. Ray on any § 1985(3) claim based on § 1981, but **WILL DENY** summary judgment on the § 1985(3) claim based on the Equal Protection Clause.

### 4.   State Law Claims Against Mr. Little and Mr. Ray

Counts Seven through Twelve assert state law claims against Mr. Little and Mr. Ray for defamation per se, false light invasion of privacy, and tortious interference with business relations.  (Doc. 23 at 29–35).

#### a.   *Defamation Per Se*

Mr. Odom alleges that Mr. Little defamed him during a December 3, 2019 city council work session by accusing Mr. Odom of "falsifying documents and stuff." (Doc. 23 at 29–30; *see* doc. 57-7 at 18–19; doc. 59, Ex. J at 30:02–07).

As for Mr. Ray, neither the amended complaint nor the section of Mr. Odom's brief addressing his defamation claim against Mr. Ray identify the specific statements that form the basis of the claim. (*See* doc. 23 at 32–33 (alleging that "on multiple occasions . . . Mr. Ray publicly accused Mr. Odom of dishonesty and misconduct"); doc. 70 at 18 (asserting generally and without citation to any evidence that Mr. Ray accused Mr. Odom of "robbery, dishonesty, and corruption")). But based on Mr. Ray's understanding of the basis of the allegations against him (*see* doc. 67 at 6), the court finds that Mr. Odom alleges Mr. Ray defamed him when he made the following statements: (1) accusing Mr. Odom of "robbing this City," "lying," and "railroading people" during a September 3, 2019 city council work session (doc. 70 at 13 ¶ 38) (citing doc. 57-9 at 7–9); (2) accusing Mr. Odom of "lying" and calling him "corrupt" during an October 2019 city council meeting (doc. 70 at 14 ¶¶ 40–41) (citing doc. 57-9 at 15–16, 18); and (3) accusing Mr. Odom of falsifying paperwork, being "crooked to the bone," and robbing the poor during a November 19, 2019 city council meeting (doc. 70 at 15 ¶ 44) (citing doc. 57-9 at 21).

Under Alabama law, to establish a claim for defamation per se, a plaintiff must establish: "[1] that the defendant was at least negligent, [2] in publishing [3] a false and defamatory statement to another [4] concerning the plaintiff, [5] which is . . . actionable without having to prove special harm (actionable per se)." *Delta Health*

*Grp., Inc. v. Stafford*, 887 So. 2d 887, 895 (Ala. 2004). Among other arguments in support of summary judgment, Mr. Little and Mr. Ray argue that Mr. Odom cannot show that their statements constitute slander per se. (Doc. 65 at 19–20; doc. 67 at 11–12). The court agrees and therefore does not consider their other arguments.

"[T]o constitute slander actionable per se, there must be an imputation of an indictable offense involving infamy or moral turpitude." *Ceravolo v. Brown*, 364 So. 2d 1155, 1157 (Ala. 1978). Citing *Kelly v. Arrington*, 624 So. 2d 549, 549 (Ala. 1993) and *Gray v. WALA-TV*, 384 So. 2d 1062, 1065 (Ala. 1980), Mr. Odom argues that words are defamatory per se if they "are understood to impute dishonesty or corruption" or "if they directly tend to prejudice anyone in his office, profession, trade, or business, or in any lawful employment by which he may gain his livelihood." (Doc. 70 at 20; doc. 71 at 21). But *Kelly* and *Gray* are cases involving libel, not slander. *See Kelly*, 624 So. 2d at 547, 549; *Gray*, 384 So. 2d at 1065. And with "respect to the question as to whether the imputed language or words are actionable per se" Alabama law makes a distinction between libel based on written or printed content and slander based on oral statements. *Ceravalo*, 364 So. 2d at 1157 ("In cases of libel, if the language used exposes the plaintiff to public ridicule or contempt, though it does not embody an accusation of crime, the law presumes damage to the reputation, and pronounces it actionable per se. *While to constitute slander actionable per se, there must be an imputation of an indictable offense*

*involving infamy or moral turpitude*.") (emphasis added). Therefore, to prevail on his defamation claims against Mr. Little and Mr. Ray, Mr. Odom must show their oral statements impute an indictable offense involving infamy or moral turpitude.

When deciding whether a statement is slanderous per se, "a court must give the language used that meaning that would be ascribed to the language by a reader or listener of average or ordinary intelligence, or by a common mind." *Liberty Nat. Life Ins. Co. v. Daugherty*, 840 So. 2d 152, 157–58 (Ala. 2002) (cleaned up). In addition, the court must construe the alleged slanderous statement "in connection with the other parts of the conversation, in order to determine the context in which the statement was made." *Id.* at 158.

Mr. Little and Mr. Ray contend that Mr. Odom has no evidence that their comments impute any indictable offense involving infamy or moral turpitude when considered in their context of public discussion during the meetings. (Doc. 65 at 19– 20; doc. 67 at 11–12). The court agrees that no implication that Mr. Odom committed an indictable offense of infamy or moral turpitude is obvious from the face of the statements and their context. And the section of Mr. Odom's briefs addressing his defamation per se claims make no effort to identify any such offense, instead stating in a conclusory manner that they each "accus[ed] him of robbery, dishonesty, and corruption." (*See generally* doc. 70 at 18–20; doc. 71 at 20–21). Thus, Mr. Odom

has forfeited any argument on that point and has not demonstrated that Mr. Little's and Mr. Ray's statements constitute slander per se. *See Campbell*, 26 F.4th at 890.

In the section of Mr. Odom's brief in opposition to Mr. Little's motion for summary judgment that addresses his false light claim, Mr. Odom states in conclusory fashion that falsifying court records is an indictable offense. (Doc. 71 at 29). But he does not identify the offense or argue that it involves infamy or moral turpitude. (*Id.*). Moreover, Mr. Little's comment occurred during a nearly twenty-minute discussion about Mr. Little's belief that the city council had authority over the municipal court and its personnel. (Doc. 59, Ex. J at 28:00–46:15). Although Mr. Little later testified in his deposition that the documents at issue were the traffic tickets and court records associated with Ms. Thompson's prosecution (doc 57-7 at 19–26), during the city council work session, Mr. Little offered no explanation about what documents he believed Mr. Odom had falsified (*see* doc. 59, Ex. J at 28:00–46:15). Therefore, the court cannot find that those who heard his comments would understand that Mr. Little was implying Mr. Odom committed an indictable offense involving infamy or moral turpitude.

Accordingly, the court **WILL GRANT** summary judgment in favor of Mr. Little on Count Seven and Mr. Ray on Count Ten.

b.    *False Light Invasion of Privacy*

In Count Eight, Mr. Odom asserts a false light invasion of privacy claim against Mr. Little. (Doc. 23 at 31). In Count Eleven, Mr. Odom asserts the same claim against Mr. Ray. (*Id.* at 33–34).

Under Alabama law, to establish a false light claim, a plaintiff must demonstrate that the defendant (1) "gives publicity to a matter concerning another that places the other before the public in a false light," (2) "the false light in which the other was placed would be highly offensive to a reasonable person," and (3) the defendant "had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." *Regions Bank v. Plott*, 897 So. 2d 239, 244 (Ala. 2004) (quotation marks omitted).

### i.    **Mr. Little**

Mr. Odom alleges that Mr. Little placed him in a false light during the December 3, 2019 city council work session when Mr. Little accused Mr. Odom of falsifying documents and prosecutorial misconduct. (Doc. 23 at 31). Mr. Little argues that he is entitled to summary judgment on Mr. Odom's false light claim because: (1) Mr. Odom cannot show that Mr. Little's statement placed Mr. Odom in a false light that would be highly offensive to a reasonable person; (2) Mr. Odom cannot show that Mr. Little had knowledge of or acted in reckless disregard to the falsity of the statement; and (3) Mr. Little's statements during the December 3, 2019

work session are privileged. (Doc. 65 at 21–23). Because Mr. Odom has not shown that Mr. Little knew his statements were false or that he acted with reckless disregard for their truth or falsity, Mr. Little is entitled to summary judgment on the false light claim, and the court does not consider Mr. Little's first or third argument.

Mr. Little argues that Mr. Odom "has no evidence—only speculation and assumptions—that [Mr.] Little made any statement concerning him with knowledge that it was false or reckless disregard as to its truth or falsity." (Doc. 65 at 22). Where, as here, Mr. Odom bears the burden of proof at trial on this issue, Mr. Little has satisfied his initial summary judgment burden of pointing out that "there is an absence of evidence to support the non-moving party's case." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993) (quotation marks omitted). Therefore, the burden shifts to Mr. Odom to "show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was overlooked or ignored" by Mr. Little or Mr. Odom "may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." *Id.* at 1116–17 (quotation marks omitted).

Mr. Odom has done neither. The section of Mr. Odom's brief concerning the false light claim against Mr. Little is silent on this issue. It makes no argument on this point and cites to no evidence creating questions of fact about whether Mr. Little made the statements with knowledge they were false or that he acted with reckless

disregard to their truth or falsity. (*See* doc. 71 at 28–29). Mr. Odom has therefore not satisfied his burden and has forfeited any argument on this issue. *See Campbell*, 26 F.4th at 890.

Accordingly, the court **WILL GRANT** summary judgment in favor of Mr. Little on Count Eight.

### ii.    Mr. Ray

Mr. Odom alleges that Mr. Ray placed in him a false light on September 3, 2019 and on other occasions by calling him "dishonest" and "crooked" and accusing him of engaging in prosecutorial misconduct. (Doc. 23 at 34). The court assumes, as the parties appear to do, that the same statements forming the basis of Mr. Odom's defamation claim are the basis for his false light claim as well. (*See* doc. 67 at 13; doc. 70 at 26–27; doc. 79 at 7).

Mr. Ray's only argument in support of summary judgment on Mr. Odom's false light claim is that all of the statements are privileged because Mr. Ray made them in various city council meetings and work sessions. (*Id.*; citing *Butler v. Town of Argo*, 871 So. 2d 1, 24–28 (Ala. 2003)).[5]

---

[5] Mr. Ray argues for the first time in his reply brief that Mr. Odom cannot show a reasonable person would have been highly offended by his statements or that Mr. Ray knew the statements were false or acted with reckless disregard to their truth or falsity. (Doc. 79 at 7). Because Mr. Ray did not make this argument in his initial brief, the court does not consider it. *See Herring v. Sec'y, Dep't of Corr.*, 397 F.3d 1338, 1342 (11th Cir. 2005) ("As we repeatedly have admonished, arguments raised for the first time in a reply brief are not properly before a reviewing court.").

In *Butler*, the Alabama Supreme Court discussed and analyzed an absolute legislative privilege and a qualified privilege to false light claims. 871 So. 2d at 23–27. The section of Mr. Ray's brief addressing the false light claim does not advance a substantive argument about why his statements are privileged other than to state that he made them in city council meetings and work sessions, and he does not identify whether one or both of the *Butler* privileges applies. (Doc. 67 at 13). But Mr. Odom has interpreted Mr. Ray's brief on this point as adopting by reference the arguments Mr. Ray advanced with respect to the defamation claim. (Doc. 70 at 27). Therefore, the court does the same.

In that section of the brief, Mr. Ray argues his statements are covered by qualified privilege. (Doc. 67 at 11). Qualified privilege exists when the "communication is prompted by duty owed either to the public or to a third party, or the communication is one in which the party has an interest, and it is made to another having a corresponding interest." *Luxottica of Am., Inc. v. Bruce*, 2023 WL 4281606, at *4 __ So. 3d __ (Ala. June 30, 2023). A legal duty can arise out of either a legal or moral obligation. *Id.* To defeat a defendant's claim of qualified privilege, the plaintiff must show the defendant made the statement with malice. *Id.* at *4–5. Whether a statement "comes within the scope of qualified privilege," is a question of law; the question of malice "is typically a question for the trier of fact." *Id.* at *4. The privilege is broad and covers a variety of statements made in a variety of

contexts. *See Butler*, 871 So. 2d at 25–26; *Ex parte Blue Cross & Blue Shield of Ala.*, 773 So. 2d 475, 479 (Ala. 2000); *Clark v. Am.'s First Credit Union*, 585 So. 2d 1367, 1370 (Ala. 1991); *Gore v. Health–Tex, Inc.,* 567 So. 2d 1307 (Ala. 1990); *Montgomery v. Big B, Inc.*, 460 So. 2d 1286, 1288 (Ala. 1984); *Willis v. Demopolis Nursing Home, Inc.*, 336 So. 2d 1117, 1120 (Ala. 1976).

Mr. Ray argues his statements are privileged because they were born from the complaints of Anniston citizens regarding the performance of the municipal court prosecutor, which Mr. Ray had a moral duty to voice at city council work sessions and meetings. (Doc. 67 at 11). Mr. Odom counters that Mr. Ray has not established how this or any other duty required Mr. Ray to publicly state that he was "dishonest, robbing the city, and corrupt." (Doc. 70 at 21). Mr. Odom also contends—without any evidence in support—complaints were only from Mr. Little or Ms. Thompson. (*Id.*). In addition, Mr. Odom maintains that Mr. Ray used the Thompson matter for his personal agenda to have Mr. Odom removed from office. (*Id.*).

But even if Mr. Ray has demonstrated that his statements fall within the scope of qualified privilege, Mr. Odom's false light claim against Mr. Ray survives summary judgment because the record contains evidence from which a jury could conclude that Mr. Ray made the statements with malice. A private party may show common law malice "by evidence of previous ill will, hostility, threats, rivalry, other actions, former libels or slanders, and the like or by the violence of the defendant's

language, the mode and extent of publication, and the like." *Barnett v. Mobile Cnty. Pers. Bd.*, 536 So. 2d 46, 54 (Ala. 1988). Public figures must show actual malice meaning "knowledge of falsity or reckless disregard of truth or falsity." *Id.* "A defendant acts with reckless disregard if, at the time of publication, the defendant entertained serious doubts as to the truth of its publication or acted with a high degree of awareness of its probable falsity." *Smith v. Huntsville Times Co.*, 888 So. 2d 492, 499 (Ala. 2004) (cleaned up). A plaintiff may prove actual malice through various forms of circumstantial evidence, including that the information was "fabricated" or "so inherently improbable that only a reckless man would have put it in circulation." *Id.* at 500 (quotation marks and alteration omitted). A defendant's failure to investigate can constitute actual malice if "the failure evidences purposeful avoidance, that is, an intent to avoid the truth." *Id.* (cleaned up).

The parties dispute whether Mr. Odom is a private, public, or limited-purpose public figure. (Doc. 67 at 7–10; doc. 70 at 21–24). The court need not resolve that question because on the record before it, the court concludes that Mr. Odom has met his higher burden of showing that the evidence creates questions of fact about whether Mr. Ray accused Mr. Odom of corruption and dishonesty with knowledge the statements were false or with reckless disregard for their truth or falsity. (*See* doc. 70 at 25).

Here, Mr. Ray accused Mr. Odom of falsifying the tickets associated with Ms. Thompson's prosecution and of robbing the poor and the City. (Doc. 57-9 at 21, 39). As evidence of knowledge that these statements were false, Mr. Odom points to Mr. Ray's deposition testimony that he had no evidence that Mr. Odom was responsible for creating the tickets involved in Ms. Thompson's second prosecution, and in fact testified he knew a police officer was responsible for writing the tickets. (Doc. 57-9 at 25–26). In addition, Mr. Ray testified that when he accused Mr. Odom of robbing the City, he understood Mr. Odom had not actually robbed someone. (*Id.* at 39).

Mr. Odom also argues that the evidence creates questions of fact about whether Mr. Ray purposefully avoided the truth about the circumstances surrounding Ms. Thompson's case. (Doc. 70 at 25). Mr. Ray complained to a previous city manager about Mr. Odom's prosecution of Ms. Thompson, and the city manager watched the video of her arrest and discussed the matter with Mr. Odom and the police chief. (Doc. 57-6 at 98 ¶ 11). The city manager told Mr. Ray that in watching the video he "did not see anything that gave [him] pause" about Mr. Odom's conduct in prosecuting the case. (*Id.*). Although Mr. Ray responded that the videos could have been digitally altered (*id.*), Mr. Ray testified he did not watch the video of the arrest for himself (doc. 57-9 at 37). This evidence creates questions of fact about whether Mr. Ray purposefully avoided the truth surrounding the circumstances of Ms. Thompson's arrest and the basis for her prosecution.

The court agrees with Mr. Odom that a reasonable jury could conclude from this evidence that Mr. Ray made his statements about Mr. Odom with knowledge they were false or with reckless disregard for their truth of falsity. Accordingly, Mr. Ray is not entitled to summary judgment on Mr. Odom's false light claim on the basis of qualified privilege. The court therefore **WILL DENY** Mr. Ray's motion for summary judgment on Count Eleven.

###### c.    *Tortious Interference with Business Relations*

In Count Nine, Mr. Odom asserts a claim against Mr. Little for tortious interference with business relations. (Doc. 23 at 31–32). In Count Twelve, he asserts the same claim against Mr. Ray. (*Id.* at 34–35). Mr. Odom alleges that both men intentionally interfered with his business relationship with the City by calling for his termination and falsely accusing him of misconduct. (*Id.* at 32 ¶ 232, 35 ¶ 248).

Under Alabama law, to establish a claim for tortious interference with business relations, a plaintiff must establish "(1) the existence of a protectible business relationship; (2) of which the defendant knew; (3) to which the defendant was a stranger; (4) with which the defendant intentionally interfered; and (5) damage." *Walter Energy, Inc. v. Audley Cap. Advisors LLP*, 176 So. 3d 821, 828 (Ala. 2015) (quotation marks omitted).

### a.    **Mr. Little**

Mr. Little argues that he is entitled to summary judgment on Mr. Odom's tortious interference claim because: (1) Mr. Odom cannot demonstrate he was a stranger to Mr. Odom's relationship with the City; (2) Mr. Odom cannot show that any of Mr. Little's conduct damaged him; (3) his conduct was privileged; and (4) his conduct was justified. Because the court agrees that Mr. Odom cannot establish that Mr. Little was a stranger to his relationship with the City, the court does not consider Mr. Little's other arguments.

"[I]t is essential to a claim of tortious interference with contractual relations that the plaintiff establish that the defendant is a third party, i.e., a stranger to the contract with which the defendant allegedly interfered." *Waddell & Reed, Inc. v. United Invs. Life Ins. Co.*, 875 So. 2d 1143, 1153 (Ala. 2003) (cleaned up). A defendant is not a stranger to a contract if the defendant "has any beneficial or economic interest in, or control over, that relationship." *Id.* at 1154. For example, "[o]ne cannot be guilty of interference with a contract even if one is not a party to the contract so long as one is a participant in a business relationship arising from interwoven contractual arrangements that include the contract." *Id.* at 1157.

Mr. Little argues there is no dispute that he was not a stranger to the relationship between the City and Mr. Odom because he was "an inextricable and interwoven part of" the relationship. (Doc. 65 at 28). The court agrees. In support of his position, Mr. Little cites evidence that the city council, of which he was a part,

was responsible for appointing the city manager, who in turn, appointed the deputy city attorney. (Doc. 57-1 at 15, 19; doc. 57-6 at 4, 8; doc. 61-1 at 2 ¶¶ 5–6). In addition, as deputy city attorney, Mr. Odom on occasion represented the municipal court in city council meetings to provide reports and make recommendations. (Doc. 57-1 at 43). Mr. Little also cites to language from the City of Anniston Policies and Procedures Manual that gives the city council the power to "inquire into the conduct of any office . . . of the city and make investigations as to municipal affairs." (Doc. 57-5 at 66).

Mr. Odom does not dispute this evidence; rather, he maintains that Mr. Little was a stranger to the relationship because Mr. Little "had no authority or power as it related to appointing the City Attorney and deputy city attorney." (Doc. 71 at 31). But the fact that Mr. Little did "not effectively control performance under the contract" is "too narrow" a position and does not establish that Mr. Little was a stranger to the relationship. *Waddell & Reed, Inc.*, 875 So. 2d at 1157.

Because Mr. Little was not a stranger to Mr. Odom's relationship with the City, the court **WILL GRANT** Mr. Little's motion for summary judgment on Count Nine.

### b.    Mr. Ray

Mr. Ray argues that he is entitled to summary judgment on Mr. Odom's tortious interference claim because: (1) his comments about Mr. Odom do not

constitute actionable interference; (2) he was not a stranger to Mr. Odom's relationship with the City; (3) Mr. Odom cannot show that he was damaged by Mr. Ray's statements; and (4) any interference was justified. (Doc. 67 at 14–15). The court is not persuaded by any of Mr. Ray's arguments.

First, citing *DeMartini v. Town of Gulf Stream*, 942 F.3d 1277 (11th Cir. 2019), Mr. Ray argues that his statements about Mr. Odom are not actionable interference "because he had a right, as a citizen to voice his opinions" about Mr. Odom. (Doc. 67 at 14–15). The section of *DeMartini* upon which Mr. Ray relies concerned a plaintiff's § 1983 First Amendment retaliation claim. The Eleventh Circuit stated the general legal principle that "[t]he right to petition the government for a redress of grievances is one of the most precious of the liberties safeguarded by the Bill of Rights." *DeMartini*, 942 F.3d at 1288. And the Court found that the plaintiff's request for public records and filing a lawsuit was protected First Amendment activity for purposes of her retaliation claim. *Id.* at 1305. *DeMartini* is wholly inapposite to this case. *DeMartini* does not stand for the proposition that speech that otherwise might be protected by the First Amendment for purposes of a § 1983 claim cannot form actionable conduct for purposes of a state law tortious interference claim.

Second, Mr. Ray argues he was not a stranger to Mr. Odom's business relationship with the City "because his position as a NAACP president made him a

part" of the relationship. (Doc. 67 at 15). Mr. Ray cites no authority for this position, and the court rejects the notion that Mr. Ray's status as a NAACP president demonstrates that he had "any beneficial or economic interest in, or control over, that relationship." *Waddell & Reed, Inc.*, 875 So. 2d at 1154.

Next, Mr. Ray contends that Mr. Odom cannot show that he was damaged by Mr. Ray's statements. (Doc. 67 at 15). According to Mr. Ray, he was not involved in Mr. Folks's decision to remove Mr. Odom from his position. (*Id.*). Mr. Odom responds that there is evidence Mr. Ray lobbied for his termination. (Doc. 70 at 28). The court agrees. In his declaration, Mr. Folks testified that his decision to make changes to the municipal court and terminate Mr. Odom was based, in part, on public comments he heard during city council meetings. (Doc. 61-1 at 3–4 ¶¶ 16–17). And it is undisputed that Mr. Ray criticized Mr. Odom's performance as deputy city attorney during city council meetings and called for his removal. (Doc. 57-9 at 8, 15, 18, 20–21, 38). Therefore, there is evidence form which a jury could conclude that Mr. Ray's conduct influenced Mr. Folks's decision and therefore injured Mr. Odom.

Finally, Mr. Ray claims that he "was justified in making all of his alleged statements concerning" Mr. Odom. (Doc. 67 at 14). "Justification is an affirmative defense to be pleaded and proved by the defendant." *White Sands Grp., LLC v. PRS II, LLC*, 32 So. 3d 5, 12 (Ala. 2009). Mr. Odom argues that Mr. Ray did not plead

this defense. (Doc. 70 at 28). But Mr. Ray's answer to Mr. Odom's amended complaint does plead justification as an affirmative defense. (Doc. 50 at 23).

However, Mr. Ray offers nothing more than one conclusory statement that this conduct was justified. (Doc. 67 at 14). He offers no authority, evidence, or substantive argument in support of his position. Therefore, the court finds that he has forfeited any argument on the justification issue. *See United States v. Campbell*, 26 F.4th at 890; *Sapuppo*, 739 F.3d at 681.

Accordingly, the court **WILL DENY** Mr. Ray's motion for summary judgment on Count Twelve.

## III.   CONCLUSION

The court **WILL GRANT IN PART** and **DENY IN PART** the City and Mr. Folks's motion for summary judgment. (Doc. 60). The court **WILL GRANT** the motion for summary judgment as to Counts One, Three, Four, Five, and Seven. The court **WILL DENY** the motion as to Counts Two and Fourteen.

The court **WILL GRANT** Mr. Little's motion for summary judgment. (Doc. 58).

The court **WILL GRANT IN PART** and **DENY IN PART** Mr. Ray's motion for summary judgment. (Doc. 62). The court **WILL DENY** the motion as to Counts Eleven and Twelve. The court **WILL GRANT** the motion as to the part of Count Thirteen asserting a claim based on violations of § 1981, but **WILL DENY** the

motion as to the part of Count Thirteen asserting a claim based on violation of the

Equal Protection Clause**.** The court **WILL GRANT** the motion as to Count Ten.

The court will enter a separate partial judgment consistent with this

memorandum opinion.

**DONE** and **ORDERED** this September 8, 2023.

_____

**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE